## ARGUMENT

Well establishes principles of law govern the invocation of attorney-client privilege:

> The burden of establishing the attorney-client privilege rests upon the party claiming it. *Fisher v. United States*, 425 U.S. 391 (1976); *Sneider v. Kimberly-Clark Corp.*, 91 F.R.D. 1, 3 (N.D. Ill. 1980). The privilege attaches:
>
> (1) where legal advice of any kind is sought
> (2) from a professional legal advisor in his capacity as such,
> (3) the communications relating to that purpose,
> (4) made in confidence
> (5) by the client,
> (6) are at his instance permanently protected
> (7) from disclosure by himself or by the legal advisor,
> (8) except the protection be waived * * * *.
>
> *United States v. Bein*, 728 F.2d 107, 112 (2d Cir. 1984), *cert. denied, sub. nom. DeAngelis v. U.S.*, 469 U.S. 837 (1984), *quoting United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961); accord, *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1036 (2d Cir. 1984); *In re Horowitz*, 482 F.2d 72, 80-81 n. 7 (2d Cir. 1973) *cert. denied*, 414 U.S. 867 (1973), *reh. denied*, 414 U.S. 1052 (1973).
>
> The attorney-client privilege is triggered only by a client's request for legal, as contrasted with business advice, and is "limited to communications made to attorneys solely for the purpose of the corporation seeking legal advice and its counsel rendering it." *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1037. When the ultimate corporate decision is based on both a business policy and a legal evaluation, the business aspects of the decision are not protected simply because legal considerations are also involved. *SCM v. Xerox*, 70 F.R.D. 508, 517 (D. Conn. 1976).
>
> Furthermore, the privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney. *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981).
>
> Finally, the party who wishes to claim the privilege must take appropriate action to preserve the confidentiality of the documents. *In*

> *re Horowitz*, 482 F.2d at 82; *see also, Teachers Ins., Etc. v. Shamrock Broadcasting Co.*, 521 F. Supp. 638, 645 (S.D.N.Y. 1981).

*Hardy v. New York New, Inc.*, 114 F.R.D. 633, 644-45 (S.D.N.Y. 1987) (citations omitted). An additional consideration in this case, as it concerns an agency's invocation of the privilege, is whether the privilege should even be applied to the type of information sought under the FOIA request. *See generally*, "The Government's Attorney-Client Privilege: Should It Have One?" *Public Counsel*, Maryland State Bar Association's Public Counsel Newsletter (January 2000).

Petitioner contends that the NRC failed to protect its allegedly privileged information by failing to protect from disclosure to the public Mr. Shapar's extended discussion of the substance of his note to Mr. Hennessey. By failing to protect from public disclosure that information, the agency cannot now reasonably claim that there is any privilege protecting the remainder of the information. A party may not successfully assert the privilege when its conduct is inconsistent with an intention to keep information confidential. *See Hardy v. New York News, Inc.*, 114 F.R.D. 633, 644-45 (S.D.N.Y. 1987) (failure by counsel to segregate confidential information from general corporate files destroys privilege); *see also Donovan v. Fitzsimmons*, 90 F.R.D. 583, 585 (N.D. Ill, 1981) (when allegedly privileged documents are produced without a timely invocation of privilege, the party failing to invoke privilege is deemed to have waived any right to assert it later).

Significantly, voluntary or inadvertent disclosure of an otherwise privileged document also waives the right to assert the privilege. *In re Sealed Case*, 877 F.2d 976, 980 (D.C. Cir. 1989) ("If a client wishes to preserve the privilege, it must treat the confidentiality of attorney-client communications like jewels--if not crown jewels."). Here, the NRC's failure to make any effort to protect from disclosure Mr. Shapar's recounting of what the NRC now claims is privileged information shows that the agency did not care to protect that information. Rather than "crown jewels" the agency handled this information as if it were just another can of beans. The FOIA request at issue asks for disclosure of a document that is on the identical subject as the disclosure contained in the cited footnote to Shapar's memo--in fact, it is merely request for the very document Shapar tells Commissioner Ahearne he is summarizing. Here, where the NRC failed to invoke the privilege to protect Shapar's summary of his note to Hennessey, the waiver of privilege implicit in that disclosure is a complete bar to the NRC's assertion of privilege to all other communications regarding the same subject. *Glenmede Trust Co. v. Thompson*, 55 F.3d 476, 486-87 (3d Cir. 1995); *In re Martin Marietta Corp.*, 856 F.2d 619, 623 (4th Cir. 1988).

The NRC's failure to protect Shapar's memo to Ahearne is an 'implied' waiver of its privilege claim for the subject matter discussed in that memo. An 'implied waiver' occurs whenever a party asserting the privilege discloses the same subject matter as contained in the allegedly confidential communication to someone who is

outside the privileged relationship. *See generally*, 26A CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5722 (1992); *see also Sheet Metal Workers Int'l Assoc. v. Sweeney*, 29 F. 3d 120, 125 (4th Cir. 1994) (any voluntary disclosure to a person outside the privileged relationship waives the privilege); *accord, United States v. Oloyede*, 982 F.2d 133, 141 (4th Cir. 1993); *In re Martin Marietta Corp.*, 856 F. 2d at 623; *In re Grand Jury Proceeding*, 727 F.2d 1352, 1357; *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) Jones at 1072 ("The burden is on the proponent of the attorney-client privilege to demonstrate its applicability [citations omitted].

The proponent must establish not only that an attorney-client relationship existed, but also that the particular communications at issue are privileged and that the privilege was not waived. Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the attorney-client privilege. Any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter. . . .)

The NRC waived its privilege when it placed Mr. Shapar's memorandum in the public document room in 1980; it reaffirmed that waiver when it provided a copy to petitioner's counsel in the instant matter. The beans have been out of the proverbial can since 1980. The NRC cannot "re-can" by merely making a contemporary assertion of the privilege. The Commission has no right to assert a

privilege now for the very same information that Mr. Shapar briefed to Commissioner Ahearne within a *publicly released* memorandum. The subject matter is, according Shapar, identical to that in the document for which the NRC is claiming privilege. The allegedly privileged "note" merely provides a more complete version of the basis for believing that Congress intended that NRC hearings take place "on the record." Given the circumstances--i.e., the NRC's recent rulemaking that the agency justifies by claiming the exact opposite and the pending petition for review of that action in the United States Court of Appeal for the First Circuit--the public interest in disclosure in and of itself should over-ride any assertion of privilege, let alone the assertion of a defective one.

The kind of disclosure that took place when Commissioner Bradford made public the Shapar memo to Ahearne accomplished a waiver of the privilege as to the specific information disclosed therein and (significantly) any privilege as to the subject mater of the disclosure. *Sheet Metal Workers Int'l Assoc.*, 29 F.3d at 125; *Oloyede*, 982 F.2d at 141; *In re Martin Marietta Corp.*, 856 F.2d at 623; *In re Grand Jury Proceedings*, 727 F.2d at 1357; *Jones*, 696 F. 2d at 1072. The "note" is the detailing of that subject matter. No privilege attaches to it now. Under these circumstances, the claim of privilege cannot stand. The document at issue should be released to the public.

CONCLUSIONS

For the foregoing reasons, the Commission should reverse its determination in this matter and order that the documents satisfying FOIA/PA 2004-160 be released to the petitioner forthwith and without any further delay.

Respectfully submitted:

CITIZENS AWARENESS NETWORK, INC.

BY: ______________________

Jonathan M. Block, Attorney at Law
94 Main Street
P.O. Box 566
Putney, VT 05346-0566
802-387-2646 (voice)
802-387-2667 (fax)
jonb@sover.net

EXHIBIT 'E'

UNITED STATES
**NUCLEAR REGULATORY COMMISSION**
WASHINGTON, D.C. 20555-0001

SECRETARY

May 11, 2004

Rec'd 5/21/2004
mailed by NRC 5/18/2004

Jonathan M. Block, Esq.
94 Main Street
P.O. Box 566
Putney, VT 05346-0566

IN RESPONSE REFER TO
2004-004A

Dear Mr. Block:

I am responding to your letter of April 27, 2004, to the Freedom of Information Act/Privacy Act Officer, in which you appealed the agency's April 15, 2004, response to your Freedom of Information Act (FOIA) initial request 2004-0160, dated March 15, 2004. You requested a copy of a note from Howard Shapar to Joseph Hennessey dated April 3, 1967. This record was denied on the basis of exemption 5, as attorney-client privileged information.

Without conceding that the NRC is bound by law to grant your appeal, I have decided to make a discretionary release of a portion of this document–the portion dealing with section 189a.

This is a final agency decision. As set forth in the FOIA (5 U.S.C. 552(a)(4)(B)), judicial review of this decision is available in a district court of the United States in the district in which you reside or have your principal place of business, or in which the agency records are situated, or in the District of Columbia.

Sincerely,

Annette L. Vietti-Cook
Secretary of the Commission

EXHIBIT "F"

E4 5

1

<date> 19670403 </date>
<to> Hennessey </to>
<from> Shapar, Howard </from>
<subject> MANDATORY HEARING REQUIREMENTS OF SECTION 189 OF THE ATOMIC ENERGY ACT; SUBJECTION OF SUCH HEARINGS TO SECTION 5 OF THE APA AND SECTION 5(a) OF S. 518 </subject>

DOC-NO: OGC-198

DATE: 04/03/67

TYPE: Internal OGC

TO: Mr. Hennessey

FROM: Howard K. Shapar

SUBJECT: MANDATORY HEARING REQUIREMENTS OF SECTION 189 OF THE ATOMIC ENERGY ACT; SUBJECTION OF SUCH HEARINGS TO SECTION 5 OF THE APA AND SECTION 5(a) OF S. 518

PAGES: 005

During the testimony of Arthur Gehr before the Subcommittee on Administrative Practice and Procedure of the Senate Judiciary Committee on S. 518, a bill to amend the Administrative Procedure Act, there was some discussion between him and Bernard Fernsterwald, the counsel of the subcommittee, as to whether our section 189 hearings on reactor license applications might not fall within the scope of section 5(b) of the APA, as it would read after the passage of S. 518.

Provisions of the APA and S. 518 relating to adjudications

Section 5 of the Administrative Procedure Act contains provisions (relating to, among other things, separation of functions) which are applicable 'in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing,' with certain exceptions not pertinent here. Sections 7 and 8 contain provisions applicable to hearings and decisions in cases subject to section 5. The Administrative Procedure Act does not now contain any provisions specifically applicable to adjudications other than those 'required by statute to be determined on the record after opportunity for an agency hearing,' i.e., formal adjudications.

S. 518 includes, with some important changes not relevant to the immediate discussion, the provisions applicable to formal adjudications in section 5 of the present APA in section 5(a) of the bill. In addition, a new section 5(b) would be added, applicable to 'all other adjudications' which, in general, would direct the agency to provide procedures which shall promptly, adequately and fairly inform the agency and the parties of the issues, facts and arguments involved. Section 5(b) contains no provisions relating to separation of functions. Under S. 518, sections 7 and 8 would be applicable to cases subject to section 5(a) but not to cases subject to section 5(b).

Subjection of AEC hearings under section 189 of the Atomic Energy Act to section 5 of the present APA and section 5(a) of the APA as revised by S. 518

A-1

Section 189 a. of the Atomic Energy Act provides, in pertinent part:

'The Commission shall hold a hearing after thirty days' notice and publication once in the Federal Register, on each application under section 103 or 104 b. for a construction permit for a facility, and on any application under section 104 c. for a construction permit for a testing facility.'

A mandatory hearing requirement for the issuance of facility licenses was first added to the Act in 1957 (P.L. 85-256, sec. 7). A hearing was required on each application for a license under section 103 and 104 b. and on each application for a license for a testing facility under section 104 c. While the language of section 189 a. did not then, and does not now, specifically state that the hearing and adjudication shall be 'on the record' and in conformity with sections 5, 7 and 8 of the APA, the legislative history of section 189 indicates that such a hearing and adjudication were intended, and the Commission has so interpreted the provision.

In introducing S. 1684, which contained the mandatory hearing requirement enacted in P.L. 87-256, Senator Anderson stated:

'When the Atomic Energy Act was amended 3 years ago, I made the following statement on the floor of the Senate on July 14, 1954, expressing my opinion as to the advisability of public hearings on reactor license applications:

'... But because I feel so strongly that nuclear energy is probably the most important thing we are dealing with in our industrial life today, I wish to be sure that the Commission has to do its business out of doors, so to speak, where everyone can see it.

'Although I have no doubt about the ability and integrity of the members of the Commission, I simply wish to be sure they have to move where everyone can see every step they take; and if they are to grant a license in this very important field, where monopoly could so easily be possible, I think a hearing should be required and a formal record should be made regarding all aspects, including the public aspects.'

'Almost 3 years have now passed and I believe my words of 1954 are still applicable.' (emphasis added) (Cong. Record, March 21, 1957, p. 3616)

In carrying out the requirement of the 1957 amendment to hold hearings in cases involving power and test reactor licenses, the Commission took the view that the hearing and decision had to be in compliance with the provisions of sections 5, 7 and 8 of the APA. The Commission's position was articulated, among other times, when amendments to the Act, which resulted, in 1962, in some liberalizing of the mandatory hearing requirement, were under consideration.

At the conclusion of the hearings which preceded the enactment of the amendments, a panel discussion among Commissioner Olson, Professor Kenneth C. Davis, Professor David F. Cavers, Mr. Lee Hydeman and Dr. Theos J. Thompson was conducted (Radiation Safety and Regulation, Hearings before the Joint Committee on Atomic Energy, 87th Cong., 1st Sess., pp. 372-389). Professor Davis took issue with the Commission's view that section 189 required a trial-type hearing. Commissioner Olson reiterated the Commission position that a formal hearing of record is required, submitting for the record an AEC memorandum in support (Id., pp. 382-5).

After the close of the hearings, the exchange between Professor Davis and the Commission continued, through letters to the JCAE staff, publication by Professor Davis of an article in the American Bar Association Journal, and replies thereto. In the course of this exchange, General Counsel naiden, in a letter dated September 6, 1961 to Mr. Ramey as executive director of the JCAE, stated that 'Section 189(a) of the Atomic Energy Act explicitly requires a hearing on the record conducted in accordance with the APA. For the Commission to have made any other interpretation would have been inconsistent with what we believe to have been the intent of Congress in adopting the mandatory hearing requirement.'

The Congress, in effect, ratified the Commission's interpretation of the mandatory hearing requirement when it passed the 1962 amendments to the Act. One of these amendments was the addition of section 191 to the Act. That section provides, in part:

'a. Notwithstanding the provisions of sections 7(a) and 8(a) of the Administrative Procedure Act, the Commission is authorized to establish one or more atomic safety and licensing boards, each composed of three members, two of whom shall be technically qualified and one of whom shall be qualified in the conduct of administrative proceedings, to conduct such hearings as the Commission may direct and make such intermediate or final decisions as the Commission may authorize with respect to the granting, suspending, revoking or amending of any license or authorization under the provisions of this Act, any other provision of law, or any regulation of the Commission issued thereunder.' (Emphasis supplied)

Since sections 7 and 8 of the APA are applicable only to adjudications required to be determined on the record after opportunity for agency hearing which are subject to provisions of section 5 of the APA, an exception from the requirements of subsections 7(a) and 8(a) to permit the use of atomic safety and licensing boards in lieu of hearing examiners would not have been necessary unless the hearings to be conducted and adjudications to be made by the boards were considered to be subject to section 5. The report which accompanied the amendments as enacted so stated the understanding of Congress in explaining the exceptions:

'This language ('notwithstanding the provisions of sections 7(a) and 8 of the Administrative Procedure Act') is intended only to provide the Commission with specific authority to use a three-man Board to preside at hearings in lieu of a hearing examiner, and to permit final, as well as intermediate decisions to be made by the Board . . .

'The great bulk of the provisions of the Administrative Procedure Act will remain applicable, pursuant to section 181 of this act, and the only exceptions authorized by these amendments are to permit the Board to preside at hearings in lieu of a hearing examiner, and to permit the Board to render final as well as intermediate decisions.' (U.S. Code, Congressional and Administrative News, 87th Cong., 2nd Sess., 1962, p. 2213)

E45

Page 4

4

Ex 5

A-130